**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**STELLA KONDO-DRESSER,**

                               **Plaintiff,**                   04-CV-0392(Sr)

**v.**

**BUFFALO PUBLIC SCHOOLS,**

                               **Defendant.**

_____

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment.  Dkt. #8.

Plaintiff, represented by counsel, commenced this action seeking damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e _et seq._ ("Title VII"), and the New York Human Rights Law, Article 15 of the Executive Law, § 290 _et seq._ ("NYHRL"), claiming discrimination and harassment on the basis of gender and race, and retaliation resulting in her constructive discharge.  Dkt. #1.

Currently before the Court is defendant's motion for summary judgment. Dkt. #18.  For the following reasons, defendant's motion is granted in part.

# **BACKGROUND**

Plaintiff commenced employment with the Buffalo Public Schools as a Special Education Teacher beginning in September of 2000. Dkt. #57, ¶ 2. On the form she submitted to the Buffalo Police Department authorizing a check of her criminal record, plaintiff reported her race as "WHT". Dkt. #19-2, p.2.

Plaintiff's initial placement was at Riverside High School as an inclusion teacher. Dkt. #19-3, p.5. Her evaluation report for the 2000-2001 school year was positive, with comments indicating an excellent knowledge of subject matter; ability to express ideas clearly and direct pupils effectively; ability to analyze and adjust to student needs and work well with the administration; and a very positive and enthusiastic personality and cooperative and helpful attitude. Dkt. #50, p.3.

Plaintiff chose an assignment as a consultant teacher for 8th grade inclusion students at School #31 for the 2001-2002 school year. Dkt. #19-3, p.6 & Dkt. #57, ¶ 2. In response to a Memorandum from Rita Fraiser, Principal at School #31, advising all faculty and staff that the deadline for transfer requests for the 2002-2003 school year was March 23, 2002, plaintiff requested a transfer as soon as possible because:

> Mr. Morris has repeatedly singled me out and called me into his office for meetings to discuss matters which a reasonable person would perceive as frivolous and contrived. [He] has exhibited behaviors/actions which constitute harassment and discrimination and his allegations against me of wrongdoing have no merit. Mr. Morris has created a hostile work environment for me and has made it impossible for me to continue working at School #31.

Dkt. #43, p.3.  Mr. Morris was the assistant principal at School #31 from 2000-2003.

Dkt. #35, p.4.  In a six page attachment, plaintiff outlined six incidents in support of her complaint:

> 1.  In early September, 2001, Mr. Morris walked into the resource room and "ordered" plaintiff to meet with him in his office at 1:00 p.m. "without stating whether or not the meeting was disciplinary in nature so as to afford me the opportunity to obtain Union representation."  When she met with Mr. Morris, he informed her that Miss Dixon had informed him that plaintiff "did not want to cooperate and walk with/supervise students to the library."  Plaintiff explained that because all of the other teachers were only scheduled for one trip to the library she "did not want to walk on two trips" as Ms. Dixon had requested.
>
> 2.  Mr. Morris asked plaintiff to meet with him on January 11, 2002 to address "some concerns."  However, when plaintiff arrived at the meeting with a union representative, Mr. Morris simply informed plaintiff that Individualized Educational Plans were now available on line.
>
> 3.  In March or April of 2002, Ms. Fraiser approached plaintiff while she was on lunch duty and asked her if she was interested in changing assignments within the school to take over a new self-contained 7th and 8th grade classroom.  Plaintiff explained:
>
>> These are all students who have serious behavioral problems and self-contained or receive all of their instruction in one classroom (under constant supervision).  I told her that I was not interested in this type of unit.  I asked her if she had approached other inclusion teachers such as Mrs. Chiu or Mrs. Giorgi-McDonald.  She stated that neither one expressed interest in the unit.  Mrs. Fraiser told me that Mr. Morris had recommended that I be assigned to this unit.  I responded by saying, "of course he did, it's the worst assignment in the school."  I then told her that Mr. Morris had a serious problem with me and where I'm concerned, his objectivity is questionable.  In effect, I made it known to her [that] Mr. Morris was incapable of demonstrating fairness where I'm

concerned. I pointed out to her that if the other two teachers were not interested in the unit, and they were released from consideration, then why would it automatically fall to me? She declined to discuss it further. Subsequently, I spoke to her in her office and she told me that I would more than likely be assigned to this unit. At this time I voiced my objection to this assignment.

4. Mr. Morris asked to meet with plaintiff in his office on March 7, 2002. Because her union representative was absent, plaintiff arrived at Mr. Morris' office alone and "presented him with a handwritten memo . . . outlining [her] request for information pertaining to the meeting and/or postponement until such time that my Union representative could be present." Mr. Morris declined to sign the document and "continued the meeting anyway (a portion of which is tape recorded)." Mr. Morris "accused" plaintiff of leaving early on Tuesday, March 5th without telling an administrator and leaving the Language Arts Examinations in her room in violation of procedures for test security. Plaintiff explained that she had provided a leave slip and that she had locked the exams in her room.

5. When plaintiff went to the office to attempt to locate the leave slip she had provided on the morning of March 5th, Mr. Morris told plaintiff "she had no authority to look through the slips." Later, when she attempted to enter the same area to acquire a blank slip to request leave, she was "physically prevented . . .from entering the administrative area" by a secretary who informed her that "Mr. Morris told me to keep you out of here."

6. Mr. Morris gave plaintiff a new duty assignment, causing plaintiff to complain that she has

> 17 special ed students on my 8th grade list (which is too many to serve effectively to begin with) and now the lunch duty has eliminated another class period during which to provide services. This is further evidence of Mr. Morris' discriminatory behavior towards me. He has systematically manipulated my schedule which reduces my instructional time with students, precluding me from performing my duties as a teacher effectively.

Dkt. #43, p.3-8.  The request for transfer and its attachment was copied to plaintiff's union representative, special education supervisor and her attorney.  Dkt. #43, p.9.

By letter to whom it may concern dated April 9, 2002, Ms. Fraiser opined that

> Mrs. Dresser is a dedicated educator, who demonstrates superb organizational and management skills.  She assisted in coordinating our Special Education program in the areas of planning and evaluation.  Mrs. Dresser services students as a resource teacher on the seventh and eighth grade levels.  She has a great rapport with students and staff.  I have found her to be [a] talented individual, whose professionalism has been an asset to our program.
>
> It is my opinion that Mrs. Dresser will be a welcome addition to any faculty.

Dkt. #49, p.2.

By letter dated June 20, 2002, Mark Sposato, Associate Superintendent for Instructional Services, and Laura Dudley, Executive Director for Human Resources, advised plaintiff that it was not possible to honor her request for a transfer because the "Board of Education's policy does not allow probationary or temporary teachers a transfer option."  Dkt. #19-9, p.2.

Fatima Morrell, the principal at School 31 beginning with the 2002-2003 school year, recalled that upon her arrival, plaintiff wrote a note requesting that Mr. Morris not be her supervisor "[b]ecause of something that happened the year before I got there."  Dkt. #32, pp.4-5 & 9.  Specifically, plaintiff wrote Ms. Morrell a

Memorandum dated September 30, 2002,

to inform [Ms. Morrell] of a situation that occurred last school year. Mr. Morris repeatedly singled me out and called me into his office for meetings to discuss matters which a reasonable person would perceive as frivolous and contrived. His attempts to create a reason/situation in order to issue a formal disciplinary action were unsuccessful to my knowledge. His action constituted harassment and discrimination and his allegations had no merit.

I have a file with extensive documentation to prove at least seven incidents, including a tape recording of Mr Morris denying me union or legal representation during a meeting in which he had every intention of issuing a formal disciplinary letter. In fact, he was legally obligated to inform me before the meeting that the purpose of such meeting was to administer a disciplinary action to afford me the opportunity to seek representation. The documentation I have gathered refutes his allegations and clearly indicates that Mr. Morris has no reservations about making false statements, violating federal and state laws, and abusing his authority to further his own personal agenda.

During the summer, I requested a transfer to another school based on the information I provided to the Special Education Director [Ms. Markel] regarding Mr. Morris' administrative conduct. I was denied such transfer and told that under the union contract, I had to remain at School #31 for at least another year.

Ms. DeTallio [Special Education Coordinator] informed me last Friday that Mr. Morris requested that she develop a schedule requiring me to serve 7th and 8th grade students. I would like to know if Ms. DeTallio will also be developing such a schedule for all the other special education teachers in the building. In light of Mr. Morris' prejudicial behavior last year, I would like to know why Ms. DeTallio has been asked to perform such a task again this year? The schedule she developed for me at Mr. Morris' behest last year was immensely ineffective.

As I expressed to you previously, I see you as a strong leader who is knowledgeable, visible (proactive), well organized, energetic, and focused. I am hopeful that this matter can be resolved to our mutual satisfaction.

Dkt. #36, pp.2-3.  In response to this memorandum, Ms. Morrell informed plaintiff that she would assume responsibility for observing and evaluating plaintiff.  Dkt. #32, p.17.

Ms. Morrell observed plaintiff in the classroom on January 10, 2003.  Dkt. #33, p.24.  Ms. Morrell opined that her observation of plaintiff was "not really good" and "was pretty bad, in fact."  Dkt. #33, p.24.  When Ms. Morrell attempted to discuss her observation of plaintiff, "the first time she had reported back to school" following the observation, plaintiff "refused to discuss the evaluation with me and to review it."  Dkt. #34, pp.8 & 11.  Ms. Morrell couldn't remember if she or Ms. Kapsiak was going to do another observation of plaintiff, but did recall that as soon as plaintiff was informed that she would be observed, "she became ill all of a sudden . . . and left for the day, mid-day."  Dkt. #34, p.19.

By Memorandum to plaintiff dated January 14, 2003, Ms. Morrell documented

> the conference I held in my office on 1/9/03 with you and Mrs. Kapsiak, Assistant Principal.
>
> • A schedule was developed which allows for you to provide resource and consultation services daily.  In order to be in compliance with the Individualized Educational Plans of all students in your case load, adequately meet their needs, as well as provide support for some of our "at risk" 8th grade students, it is the administration's expectation that you will adhere to the provided schedule.
>
> • On 1/8/03, you were observed by Ms. Kapsiak at approximately 3:30 p.m. driving down Broadway near Jefferson Avenue.  You are reminded that the hours of service for teachers at Stanton Academy are 8:55 a.m. to 3:35 p.m.  You have been informed that you are not relieved

> of your duties, and should not leave the school building
> before 3:35 p.m.

Dkt. #37, p.2.  Ms. Morrell explained that she wrote the note because plaintiff

> was not providing any services to students from my
> knowledge from my observations.  I felt she needed a more
> structured schedule.  This was an attempt to do that.
>
> B, she was also leaving the building early and had been
> seen by the other administrator.

Dkt. #32, p.24.  Although this was the first time Ms. Morrell had written plaintiff up, it

"wasn't the first time that [it] had been reported that she was leaving the building early."

Dkt. #32, p.25.  Ms. Morrell indicated that she has

> write-ups on teachers that don't come to work on time, leave
> early, show up whenever, there are memos on anybody that
> is doing something inappropriate.  She was never singled
> out.  We didn't know she was Hispanic.

Dkt. #33, p.19.  She also explained that she and Ms. Kapsiak "could not find [plaintiff]

on many occasions.  We did not know where she was" and "didn't know when she was

servicing kids."  Dkt. #32, p.25.  Ms. Morrell estimated that she was unable to locate

plaintiff "four times in a two week period" and added that "the regular teachers were

also complaining" that plaintiff "could not be found half the time."  Dkt. #34, pp.30-31 &

35.  Ms. Morrell also indicated that the school was attempting to develop a co-teaching

model, but plaintiff "refused."  Dkt. #34, p.51.


> In response, plaintiff prepared the following Memorandum to Ms. Morrell,

dated January 15, 2003:

> The schedule you provided is not appropriate and clearly not
> in compliance for the following reasons:

- you failed to examine the most CURRENT IEP's developed at the last annual review/reevaluation to identify the placement, level of service and number of periods served.

<u>EXAMPLE</u>: You have (Student A) pulled out for resource Math.  His IEP indicates resource daily for 1 period only for Reading.  The reason he should NOT be pulled out for Math is because his assessment results indicate an overall math level of 12.0 (12th Grade!).  In fact, his Quantitative score on the Stanford-Binet Intelligence Test is 120.  (average =100, high average = 115) Obviously, this student needs [an] enriched/advanced math curriculum, not resource placement.

* * *

The remaining students (examples: Students C, D, F, G, H and I) have IEPS that require resource services for ELA and Math which is pull out for resource 3 times in a 6-day cycle for each subject area.  These IEPs reflect the placement (Inclusive setting) and level of support (resource, CT direct, or CT indirect) that should be provided.  Under the New York Regulations of the Commissioner,

> "Consultant teacher services means direct and/or indirect services, as defined in this subdivision, provided to a student with a disability who attends <u>regular education </u>classes and/or to such student's regular education teachers."

Under IDEA, children with disabilities are to be educated "to the maximum extent appropriate" in the "least restrictive environment."  The least restrictive environment is the regular education classroom.  The inclusionary movement has a legal basis/foundation under the 14th Amendment, which protects the constitutional rights of disabled students to have equal protection under the law and have access to the same educational environment/opportunities that nondisabled students enjoy.  (Equal Protection Clause, case-law)

Additionally, in your memo you informed me that I am not relieved my of my duties until 3:35 and should not leave the building before this time.  Please note the following:

- The day in question, January 8th, Ms. Peoples left the school building at the SAME TIME that I did.  (It is important to note that my bus duty had concluded since the bus I'm responsible for had already concluded its pick-up and left).

- On Tuesday, January 14th, I was conducting bus duty when I noticed Ms. Peoples leaving the school building at 3:25 p.m.  She obviously hasn't received any memo reminding her or her obligation to remain on campus until 3:35.

- If you had taken the time to examine the sign-in sheets, you would have noted that I routinely arrive to work ½ hour to 1 hour before 8:55 a.m. (Official start time).

- On numerous occasions I conducted bus duty until 3:45 or 4:00 p.m. for bus 631 (which usually has a habit of running late).  I consistently arrive early in preparation for the day and at times I stay later than required, yet I have never received a courteous gesture, or any form of acknowledgment from you.  But the one time you notice I leave less than 5 minutes early, despite the fact that my bus had concluded it[s] rounds and left, you choose to take issue with it.

Your actions clearly reflect disparity of treatment and it is apparent that you have every intent to harass me and persecute me.

Dkt. #38, pp.2-4.  With respect to plaintiff's complaint about being assigned to assist students who did not have an IEP, Ms. Morrell explained that Ms. Ditallo was assigning at risk children to all the special education teachers in an attempt to get the most needy students assistance.  Dkt. #33, p.14.  Ms. Morrell "thought under the no child left behind act that [she] could have [plaintiff] service some of those kids because they were two to three grade levels behind," but was subsequently informed that she could not.  Dkt. #32, p.27; Dkt. #33, p.17.

Amele Kava Carswell, retired Director of Special Education for the Buffalo Public Schools, supervised plaintiff between 2001 and 2002 or 2003.  Dkt. #29, pp.4 & 6.  Ms. Carswell recalled Mrs. Rubinstein asking her to visit plaintiff in response to her concerns about scheduling, but couldn't recall the exact date, explaining that plaintiff

> was out on sick leave quite a bit that year so I didn't get to see her a lot.  But I would. . . .  go out to see her but often times she would not be there when I would go to the building because she was on sick leave. Several instances I do remember going out to the building . . . to be told that she was on leave.  So when I actually connected with her, I can't give you a specific date.

Dkt. #29, pp.9-10.  Ms. Carswell denied anyone ever asking her opinion as to whether the teacher schedules at School 31 were compliant with the regulations of the Commissioner of Special Education.  Dkt. #29, p.14.  However, Ms. Carswell did recall receiving a call from Ms. Morrell asking her "[t]o come out and look at the schedules," but repeated that despite several attempts, plaintiff was not in the building so Ms. Carswell "never got a chance to really observe her in trying to implement the schedule." Dkt. #29, p.17.


By Memorandum to Superintendent Canedo dated January 21, 2003, plaintiff requested an immediate transfer due to harassment and discrimination by management.  Dkt. #45, p.2.  In support of her request, plaintiff recounted that:

> On December 10th, I was working in the 8th grade Language Arts classroom and Ms. Morrell called me out into the hallway.  When I walked outside into the hallway, it was apparent that she was extremely angry and began to yell at me asking why the door to the resource room was closed. She pointed to the 8th grade LA classroom and shouted the following, "you are not doing anything in there."

Dkt. #45, p.3.  Ms. Morrell denied that any such conversation ever took place.  Dkt. #33, p.15 & Dkt. #48, p.3.  Plaintiff also complained about classroom management and questioned whether Ms. Morrell's response to her concerns – to place disruptive students in the resource room for English and Math and have plaintiff provide instruction separately – was legal.  Dkt. #45, p.4.  Plaintiff further complained that Mr. Morris had "been entering my room on a daily basis with tacit approval by Ms. Morrell" and alleged that Mr. Morris and Ms. Morrell were "creating a hostile, stressful work environment for me" causing health problems.  Dkt. #45, p.4.  Plaintiff noted that she had made three requests for a transfer without success and asked Superintendent Canedo to allow her transfer to another school as soon as possible.  Dkt. #45, p.4.

Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), on January 30, 2003.  Dkt. #1-2.

In an evaluation dated January 31, 2003, Ms. Morrell commented that plaintiff was "hostile and confrontational towards administration;" "made degrading remarks to students such as 'sit your big butt down';" "has a high frequency of absences" and "does not follow procedures for reporting absences;" and "refused to give IEP records to administration upon request."  Dkt. #41, p.4.

Plaintiff went out on extended medical leave in February, 2003.  Dkt. #34, p.63.

A letter dated March 7, 2003 was prepared for Superintendent Marion Canedo's signature informing plaintiff that she would recommend to the Board of Education at the meeting on April 9, 2003 that plaintiff not be granted tenure, however, there is no evidence that this letter was actually mailed to plaintiff as required by law. Dkt. #30, pp.12-13; Dkt. #42, p.2.

On March 26, 2003, Ms. Morrell rated plaintiff's professional competence as unsatisfactory and indicated that she did not recommend plaintiff for tenure, explaining that plaintiff

> has failed to demonstrate a level of competence that would warrant granting her tenure. Her inability to accept constructive criticism and tendency to respond to reasonable requests in an inappropriate and occasionally insubordinate fashion are also factors that must be considered. It should also be noted that [plaintiff] is party to a controversial lawsuit filed against the district. The suit, among other things, alleges racial discrimination and inappropriate supervisory activities by the administration of School #31.

Dkt. #46.

Ms. Morrell sent an e-mail to Ms. Dudley, among others, dated April 3, 2003, stating that she

> received a fax on 4/2/03 that Special Education teacher, Stella Dresser, is returning to School #31 on 4/3/03. This is a teacher who has continuously stated that she was out sick because this school's administration caused a hostile work environment for her. She has a contrived law suit pending against my assistant principal and I, in which she accuses us of racial discrimination and harassment. This will certainly create an uncomfortable work environment for myself and Mr. Morris. It is my sincere belief that Ms. Dresser will use this opportunity to further manipulate and embellish her

contrived story.  She interprets any administrative directives or supervision as harassment.

Furthermore, without an entrance conference, I believe it is dangerous and highly unprofessional for Ms. Dresser to resume teaching duties at Stanton Academy #31.

Please contact me as soon as possible.

Dkt. #47.   By letter dated April 3, 2003, Ms. Dudley informed plaintiff that she had been placed on paid administrative leave.  Dkt. #44.

At the Board of Education Meeting on April 9, 2003, Ms. Canedo advised the Board that she would not be recommending three employees, including plaintiff, for appointment on tenure and was instead recommending termination of employment effective May 9, 2003.  Dkt. #52, p.3.  The Board unanimously approved the Superintendent's recommendations.  Dkt. #52, p.3.

Plaintiff became aware of the Board's termination of her employment on or about April 24, 2003.  Dkt. #57, ¶ 37.  Plaintiff met with Ms. Dudley on April 28, 2003, who advised plaintiff that her denial of tenure was based upon the January 31, 2003 evaluation by Ms. Morrell.  Dkt. #57, ¶ 38.  Plaintiff affirms that she was unaware of this evaluation prior to April of 2003.  Dkt. #57, ¶ 27.  Plaintiff argues that it was improper for Ms. Morrell to include this evaluation in her personnel file because it had not been reviewed with plaintiff within five business days of the observation as required by the collective bargaining agreement.  Dkt. #57, ¶¶ 26-27.  Following plaintiff's meeting with Ms. Dudley, the denial of plaintiff's tenure was held in abeyance.  Dkt. #57, ¶ 39.

Ms. Canedo recommended that plaintiff be awarded tenure and the Board approved that recommendation on September 24, 2003.  Dkt. #19-10, p.2.  Plaintiff affirms that she did not receive notice that she had been granted tenure until November of 2003 and never received a placement letter indicating where she should report to work for the 2003-2004 school year.  Dkt. #57, ¶ 46.  However, plaintiff affirms that she required extended sick leave from at least September through December of 2003.  Dkt. #57, ¶ 47.

The EEOC issued a Notice of Suit Rights on February 26, 2004.  Dkt. #1-3.  Plaintiff filed suit on May 26, 2004.  Dkt. #1.

## DISCUSSION AND ANALYSIS

**Title VII of the Civil Rights Act**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In the absence of direct evidence of discrimination, Title VII claims are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, and its progeny.  411 U.S. 792, 802 (1973).  This analysis requires plaintiff to establish a *prima facie* case of discrimination by showing : (1) membership in  a protected class; (2) satisfactory job performance; (3) termination or other adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination

on the basis of her membership in that class. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir. 2006). The burden on the plaintiff at this stage of the analysis is *de minimis*. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Evidence of discrimination is not required. *James v. New York Racing Assoc.*, 233 F.3d 149, 153 (2d Cir. 2000). Discrimination claims brought pursuant to the NYHRL are analyzed in the same manner as claims brought pursuant to Title VII. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

Membership in a Protected Class

Defendant argues that it was unaware that plaintiff was hispanic. Dkt. #20, p.3. In support of this argument, defendant notes that plaintiff indicated that she was white on her criminal background form. Dkt. #19-2, p.2.

Plaintiff responds that she believes that her hispanic ethnicity properly falls within the white race. Dkt. #57, ¶ 51. In any event, plaintiff argues that defendant was aware of her ethnicity because of her appearance and her willingness to speak Spanish to students and assist at parent-teacher conferences with families who spoke Spanish. Dkt. #57, ¶ 52. This is sufficient to raise a question of fact as to defendant's knowledge of plaintiff's membership in a protected class.

Satisfactory Job Performance

Defendant argues that plaintiff has failed to prove that she performed her job satisfactorily. Dkt. #20, p.6.

Plaintiff responds that she received positive performance evaluations before Ms. Morrell discriminated and retaliated against her.  Dkt. #56, p.6.

To satisfy the second element of a *prima facie* case of discrimination, plaintiff need only demonstrate that she possessed the basic skills necessary for performance of the job.  *de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16, 20 (2d Cir. 1996).  The Court of Appeals for the Second Circuit has consistently "emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001).

Plaintiff's employment by the defendant as a special education teacher for three school years, positive performance evaluation for the 2000-2001 school year and letter of recommendation by Principal Fraiser in 2002 is sufficient to satisfy plaintiff's minimal burden of demonstrating that she possesses the basic skills necessary for the performance of the job of special education teacher.

Adverse Employment Action

Defendant argues that plaintiff's complaint of being asked to make two trips to the library on one occasion and being summoned to her supervisor's office for communications she considered frivolous are insufficient to demonstrate adverse employment action.  Dkt. #20, p.7.

Plaintiff responds that her termination is an adverse employment action and that her subsequent reinstatement continued that adverse employment action because plaintiff did not receive an official placement and was "left hanging with respect to her tenure status." Dkt. #56, p.6.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Education*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir. 2003), *quoting Galabya*, 202 F.3d at 640. Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions. *See Galabya,* 202 F.3d at 640.

The incidents that spurred plaintiff's initial complaints of harassment and discrimination by Mr. Morris fall far short of adverse employment action, especially in light of plaintiff's concession that Mr. Morris did not institute formal disciplinary action against plaintiff. Dkt. #36, p.2. However, the Board's denial of tenure and termination of plaintiff's employment satisfies the third element of plaintiff's *prima facie* case.

<u>Inference of Discrimination</u>

Defendant argues that plaintiff has put forth no evidence to suggest that she was treated differently from other employees because of her sex or ethnicity. Dkt. #20, pp.7-8.

Plaintiff responds that Mr. Morris' treatment of her evidences a discriminatory intent, particularly when compared to his "cordial and polite" interactions with male, non-hispanic teachers. Dkt. #56, p.7 & Dkt. #57, ¶¶ 5-6.

As an initial matter, the Court finds plaintiff's allegations of discriminatory animus by Mr. Morris to be wholly conclusory. In any event, the Court finds no basis to impute plaintiff's allegations of discriminatory animus by Mr. Morris to Ms. Morrell. Plaintiff proffers no allegations of discriminatory animus by Ms. Morrell and nothing in the record before the Court provides any factual basis to suggest that Ms. Morrell's performance evaluation or subsequent recommendation that tenure be denied plaintiff was motivated by discriminatory animus against plaintiff because she is a woman or hispanic. As the Court of Appeals for the Second Circuit has opined, "[t]o allow a party to defeat a motion for summary judgment absent any concrete particulars, would necessitate a trial in all Title VII cases," rendering the summary judgment rule sterile. *Meiri v. Dacon*, 759 F2d 989, 998 (2d Cir. 1985).

**Hostile Work Environment/Constructive Discharge**

Defendant argues that plaintiff has failed to demonstrate that her work environment was objectively hostile or abusive or that the conditions plaintiff complains of were motivated by animus based on her sex or gender. Dkt. #20, pp.9-10.

Plaintiff responds that Ms. Morrell's improper assignment of regular education students to plaintiff and unfair evaluation of plaintiff establishes a hostile work environment and constructive discharge. Dkt. #56, p.10.

Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.* In assessing the existence of a hostile work environment, the Court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation omitted). "Isolated acts, unless very serious, do not meet the threshold of

severity or pervasiveness." *Id.* (internal quotation omitted). "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004).

With the possible exception of one allegation of being yelled at in the hallway by Ms. Morrell, plaintiff has failed to allege behavior that would rise to the level of intimidation, ridicule or insult by defendant. Even the hallway allegation can hardly be characterized as severe. In any event, plaintiff's hostile environment claim also fails for the same reason her discrimination claim fails – lack of evidence of discriminatory intent. *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (plaintiffs must also demonstrate that they were subjected to the hostility because of their membership in a protected class). "It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano,* 294 F.3d at 377 . "Otherwise, the federal courts will become a court of personnel appeals." *Id.*

**Retaliation**

Defendant argues that plaintiff has failed to establish adverse employment action or causal connection between the alleged employment action and the protected activity. Dkt. #20, p.12. Defendant also asserts that Ms. Morrell was not aware of plaintiff's ethnicity at the time she completed her evaluation of plaintiff and that plaintiff was granted tenure. Dkt. #20, pp.12-13.

Plaintiff responds that plaintiff's placement on indefinite administrative

leave demonstrates adverse employment action as set forth in *Burlington Northern v*

*White*, 548 U.S. 53 (2006).  Dkt. #56, p.12.


        Title VII's anti-retaliation provision provides that

> It shall be an unlawful employment practice for an employer
> to discriminate against any of his employees or applicants
> for employment . . . because he has opposed any practice
> made an unlawful employment practice by this subchapter,
> or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding,
> or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  In order to establish a *prima facie* case of retaliation under

Title VII, plaintiff must show: (1) she was engaged in a protected activity; (2) defendant

was aware of her participation in that activity; (3) defendant took action against her that

was materially adverse such that a reasonable employee would have been dissuaded

from engaging in protected activity; and (4) there is a causal connection between the

protected activity and the adverse action, that is, a retaliatory motive was involved.

*Burlington Northern*, 548 U.S. at 68; *Cifra v. General Electric Co.*, 252 F.3d 205, 216

(2d Cir. 2001).  "Protected activity" includes opposition to a discriminatory employment

practice or participation in any investigation, proceeding, or hearing under Title VII.  42

U.S.C. § 2000e-3(a).


        Plaintiff's filing of a complaint with the NYSDHR on January 30, 2003,

asserting discrimination due to her sex and race, constitutes protected activity.  Dkt. #1-

2.  On March 26, 2003, Ms. Morrell rated plaintiff's professional competence as

unsatisfactory and indicated that she did not recommend plaintiff for tenure in the same evaluation in which she noted plaintiff's filing of a complaint alleging racial discrimination. Dkt. #46. On April 3, 2003, Ms. Morrell advised the Executive Director for Human Resources that she believed "it is dangerous and highly unprofessional for [plainitff] to resume teaching duties at Stanton Academy #31" following plaintiff's "contrived law suit" accusing Ms. Morrell of "racial discrimination and harassment." Dkt. #47. Following these statements by Ms. Morrell, plaintiff was placed on paid administrative leave, denied tenure and terminated. Dkt. #44 & Dkt. #52, p.3. Although the denial of tenure and termination were ultimately reversed, plaintiff affirms that she was not provided notice that she had been granted tenure until November of 2003 and never received a placement letter indicating where she should report to work for the 2003-2004 school year. Dkt. #57, ¶ 46. This is sufficient to establish a *prima facie* case of retaliation.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Dkt. #18), is granted with respect to plaintiff's claims of discrimination and hostile work environment, but denied with respect to plaintiff's claim of retaliation.

**SO ORDERED.**

DATED:     Buffalo, New York
            January 19, 2010

                        **s/ H. Kenneth Schroeder, Jr.**
                        **H. KENNETH SCHROEDER, JR.**
                        **United States Magistrate Judge**